**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| **BOBBIE J. MITCHELL**, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**WHATABURGER RESTAURANTS LLC; THE WHATABURGER EMPLOYEE BENEFIT PLAN ADMINISTRATIVE COMMITTEE; and JOHN DOES 1–20**,<br><br>Defendants. | **Civil Action No.:** 5:26-cv-03833<br><br><br>**CLASS ACTION COMPLAINT** |

Plaintiff, Bobbie Mitchell ("Plaintiff"), individually and on behalf of the Class defined below of similarly situated persons, alleges the following against Whataburger Restaurants LLC ("Whataburger"), the Whataburger Employee Benefit Plan Administrative Committee (the "Committee"), and the individual members of the Committee during the relevant time period (collectively, the "Defendants"), based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

**NATURE OF THE ACTION**

1.     It is both unfair and unlawful for entities like Whataburger to impose discriminatory and punitive health insurance surcharges on employees who use tobacco products without making available a reasonable alternative standard to avoid those surcharges. This lawsuit challenges Defendants' unlawful practice of charging a "tobacco surcharge" under the Whataburger Employee Benefit Plan (the "Plan") in a manner that violates the Employee Retirement Income

Security Act of 1974 ("ERISA") and the implementing regulations. ERISA permits health-contingent wellness programs that promote health if, and *only if*, such programs strictly comply with the criteria governing these programs, including: (i) offering a meaningful and accessible *reasonable* alternative standard to any individual being charged extra based on a health factor; (ii) clearly disclosing the availability of that alternative standard—along with a statement that the recommendations of a participant's personal physician will be accommodated—in "*all* plan materials" describing the surcharge; (iii) making available the "full reward" to all participants who satisfy the reasonable alternative standard; and (iv) providing participants with the opportunity to qualify for the reward at least once per year. *See* 29 U.S.C. § 1182; 42 U.S.C. § 300gg-4(j); 29 C.F.R. § 2590.702(f). Defendants comply with none of these requirements.

2. Tobacco surcharges have become more prevalent in recent years but, to be lawful, plans must make available a compliant "wellness program" that provides employees with an avenue to avoid the surcharge. Making a compliant wellness program available means employers *must* adhere to strict rules set forth by ERISA and the implementing regulations established by the Departments of Labor, Health and Human Services, and the Treasury (collectively, the "Departments") over ten years ago in 2014. ERISA imbues the Departments with the authority to promulgate regulations interpreting ERISA § 702, 29 U.S.C. § 1182, the statute's non-discrimination provision. Accordingly, the Departments have developed a regulatory framework that "must be satisfied" to qualify for the statutory exception or safe harbor. Employers can only invoke this safe harbor if they can demonstrate full compliance with all the requirements.

3. ERISA's strict regulatory requirements are meant to ensure that wellness programs actually promote health and preclude discrimination, instead of wellness programs that are

"subterfuge[s] for discriminating based on a health factor."[1] The Final Regulations establish that for plans to be compliant, an employer must provide a clearly defined, reasonable alternative standard that allows participants to obtain the "full reward," including retroactive reimbursement of surcharges paid while completing the alternative standard; plans must also provide proper notice to all participants. *See id.*, 33159–63. First and foremost, a wellness program must be genuinely designed to improve health or prevent disease, rather than functioning as an improper penalty imposed on certain participants under the guise of a health initiative. Defendants' Plan imposes a $17.31 per week tobacco surcharge (plus an additional $17.31 per week if a participant's spouse is also enrolled and a tobacco user) on every participant who attests to being a tobacco user and who enrolls in Plan medical coverage—approximately $900 per year penalty per tobacco user (and as much as approximately $1,800 per year for a participant whose spouse is also enrolled and a tobacco user) assessed solely on the basis of a health factor—without making available or telling participants about a compliant alternative standard.

4.      The need for regulatory safeguards surrounding these types of wellness programs is underscored by studies showing little evidence that wellness programs effectively reduce healthcare costs through health improvement. Instead, the savings employers claim often result in cost-shifting onto employees with higher health risks, disproportionately burdening low-income and vulnerable workers who end up subsidizing their healthier colleagues.[2] The regulatory

---

[1] *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158, 33163 (June 3, 2013) (hereinafter the "**Final Regulations**").

[2] Horwitz, J. R., Kelly, B. D., & DiNardo, J. E. (2013). *Wellness incentives in the workplace: Cost savings through cost shifting to unhealthy workers*. Health Affairs, 32(3), 468–476, 474 ("wellness programs may undermine laws meant to prevent discrimination on the basis of health status. Since racial minorities and people with low socioeconomic status are more likely than others to have more health risks, they are also more likely to be adversely affected by cost shifting"); *see also*

safeguards seek to prevent wellness programs from being misused as thinly veiled revenue-generating schemes at the expense of employees who are least able to afford the additional costs by shifting the burden to plan sponsors to demonstrate compliance once a participant alleges discriminatory surcharges. The goal is to ensure that wellness programs operate equitably and in a non-discriminatory manner, and to promote genuine health improvements.

5.        Outcome-based programs,[3] such as being tobacco-free or completing a smoking cessation program, must offer a clearly defined "*reasonable* alternative standard," which is an alternative way for "all similarly situated individuals" to obtain the reward (or avoid a penalty) if they are unable to meet the initial wellness program standard (i.e., being tobacco-free). Critically, ERISA's implementing regulations require that "the *same*, *full reward*" must be provided to individuals who complete the alternative standard, regardless of when they do so during the plan year.[4] The Department of Labor ("DOL") has made clear that participants should not be forced to rush through the program under the threat of continued surcharges and that every individual participating in the program must receive the same reward as provided to non-smokers. *Id.* The

Dorilas, E., Hill, S. C., & Pesko, M. F. (2022). *Tobacco surcharges associated with reduced ACA marketplace enrollment*. Health Affairs, 41(3), Abstract (finding that tobacco surcharges are significant barriers to affordable health insurance).

[3] "An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward." 29 C.F.R. § 2590.702(f)(1)(v).

[4] *See* Final Regulations, 33163 ("while an individual may take some time to request, establish, and satisfy a reasonable alternative standard, **the same, full reward must be provided to that individual** as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.)" (emphasis added)).

Departments made this requirement clear when they stated it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, *every individual participating in the program* should be able to receive *the full amount of any reward or incentive* . . .." *Id.*, 33160 (emphasis added). Defendants violate these requirements by failing to make available a reasonable alternative standard that provides full reimbursement to employees who complete it, operating a non-compliant penalty structure rather than a lawful wellness incentive, and failing to clearly notify participants of all the avenues available to them to avoid the surcharge, including benefit guides, plan documents, and summary plan descriptions ("SPDs"). *Id.* These failures constitute direct violations of ERISA's wellness program regulations.

6.      Defendants cannot qualify for the statutory safe harbor because, while they impose a health-based surcharge, it does not comply with the requirements for a lawful wellness program. The Plan fails to satisfy the essential regulatory criteria, which "*must* be satisfied," (*id*., 33160; emphasis added) for a wellness program to be lawful under ERISA. 78 Fed. Reg. at 33160. Its core deficiency is that it does not make available a reasonable alternative standard that provides the "full reward" to *all* similarly situated individuals who complete it, as required by 42 U.S.C. § 300gg-4(j)(3)(D) and 45 C.F.R. § 146.121(f)(4)(iv). The Plan's Summary Plan Description ("SPD") tells participants: "You can avoid the surcharge for the entire Plan Year when the Tobacco User completes the [] tobacco cessation … **by September 30th of the Plan Year**. The surcharge will stop and you will be **refunded the surcharge you paid for that Plan Year**, less taxes, in one payment . . . ." Defendants' own description of the program is therefore a partial reward, gated by an arbitrary deadline: any participant who is unable to complete the smoking cessation program by September 30th of a Plan Year forfeits the entire reward for that year. Thus, Defendants fail to make available the "full reward" that ERISA requires be available to *all* similarly situated

5

individuals. Instead, Defendants use the unlawfully retained surcharge funds to offset their own contributions to the Plan, which allows additional money to remain in Defendants' accounts on which the company can earn interest.

7.      Defendants also violate ERISA's wellness program regulations by failing to provide the notice required by statute and regulation, which is an independent basis for liability. Federal law requires that a plan "disclose in ***all plan materials*** describing the terms of the wellness program the availability of a reasonable alternative standard." 42 U.S.C. § 300gg-4(j)(3)(E) (emphasis added) *see also* 29 C.F.R. § 2590.702(f)(4)(v). Specifically, the Plan's Enrollment Guide is a plan material describing the wellness program: it sets out the $17.31 per week tobacco surcharge, identifies who must pay it, and is distributed to employees during or near open enrollment. Yet the Enrollment Guide fails to disclose the availability of a *reasonable* alternative standard and the required statement that the recommendations of a participant's personal physician will be accommodated. *See* 29 C.F.R. § 2590.702(f)(4)(v). Similarly, an "Important Notices" documents, which is a participant-facing materials describing the terms of the tobacco wellness program omits the physician-accommodation statement. The statute's command—that this information appear in ***all*** plan materials describing the wellness program—is unambiguous. 42 U.S.C. § 300gg-4(j)(3)(E). The Enrollment Guide and Important Notices document do not satisfy it.

8.      Defendants' conduct is unlawful for at least four independent reasons. **First**, Defendants charge a premium differential based on a health factor without satisfying the wellness-program exception. **Second**, Defendants fail to provide the notice required by 42 U.S.C. § 300gg-4(j)(3)(E) and 29 C.F.R. § 2590.702(f)(4)(v) in *all* plan materials describing the surcharge, including the benefit and enrollment guides. **Third**, Defendants' own disclosures admit that the

Plan imposes an arbitrary September 30th deadline by which a participant must complete the tobacco cessation program to obtain any refund of surcharges paid that year, foreclosing the full reward for participants who cannot complete the eight-to-twelve-week program by that date. ERISA does not permit similarly situated participants who complete an alternative standard in the same plan year to receive disparate economic treatment. Rather, the same, full reward must be provided to every similarly situated individual who completes the alternative standard that plan year. **Fourth**, Defendants used the surcharge as a self-funding mechanism. The SPD provide that self-funded benefits are paid "from the general assets of the Company, employee contributions, and insurance contracts," with no obligation to segregate Company contributions. *See* the Plan's SPD, Ex. A at 101. That means every dollar of surcharge collected from participants reduced Whataburger's own funding obligation dollar-for-dollar, in breach of Defendants' fiduciary duties of loyalty under ERISA § 404(a)(1)(A).

9.     Because Defendants impose a $17.31 weekly tobacco surcharge and do not provide all similarly situated individuals with at least one opportunity to obtain the full reward or provide the required notice in all Plan materials discussing the surcharge, the Plan fails to satisfy the essential regulatory criteria, which "*must* be satisfied." Final Regulations, 33160. As a result of these deficiencies, Defendants cannot take advantage of the statutory safe harbor and, therefore, the surcharge functions as a penalty rather than a compliant wellness incentive. Deficient and misleading notice is a fundamental violation of ERISA's core anti-discriminatory purpose: ensuring that participants have a fair and compliant opportunity to be treated the same as non-smokers.

10.     Defendants also breached their fiduciary duties under ERISA by collecting and retaining tobacco surcharge payments from participants in a manner inconsistent with governing

law and using those funds to offset their own Plan-related contributions. Rather than holding participant contributions for the exclusive benefit of the Plan, Defendants commingled surcharge payments with the company's general assets and employer funds, allowing those amounts to reduce Defendants' financial obligations while participants were denied the full reward required by law. This misuse of participant-funded surcharges constitutes a breach of the duties of loyalty and prudence and gives rise to equitable relief, including disgorgement of any profits or financial benefits derived from Defendants' unlawful conduct.

11.     This Complaint alleges that Defendants impose a health-based tobacco surcharge without making available a compliant alternative standard to avoid the surcharge. Defendants bear the burden of proving that their tobacco surcharge is lawful by showing that their wellness program fully complies with *every* requirement under ERISA. Charging participants a tobacco surcharge while not informing them of a *reasonable* alternative standard that makes available the "full reward," and failing to provide proper notice makes the surcharge facially noncompliant. No amount of *post hoc* justifications can cure these fundamental defects. These types of intentional barriers and restrictions to avoiding health-based surcharges limit engagement with the program, deter participants from making the effort to improve their health, and prevent employers from taking advantage of the statutory safe harbor. Defendants' Plan is not a "program[] of health promotion or disease prevention" as required by ERISA but instead an impermissible cost-shifting scheme that unlawfully penalizes employees for their health status.

12.     Participants like Plaintiff are permitted to challenge a surcharge when there is no compliant wellness program made available or when employers provide deficient or misleading information. Once a participant alleges that a surcharge violates ERISA's anti-discrimination provisions along with facts showing the deficiencies in the wellness program, the burden shifts to

the employer, Whataburger, to demonstrate that the wellness program fully satisfies all the statutory and regulatory criteria, including the obligation to make available the "full reward" and to notify participants of the same. *See Cunningham v. Cornell Univ*., 145 S. Ct. 1020, 1029 (2025) (reaffirming "that 'the burden of persuasion as to certain elements of a plaintiff's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or *exemptions*.'").

13.    Plaintiff is a former employee of Whataburger who paid the unlawful tobacco surcharge to maintain health insurance coverage under the Plan. This surcharge imposed an additional financial burden on Plaintiff and continues to impose such a burden on those similarly situated.

14.    Plaintiff brings this lawsuit individually and on behalf of all similarly situated Plan participants and beneficiaries, seeking to recover these unlawfully charged fees and for Plan-wide equitable relief to prevent Defendants from continuing to profit from their violations under 29 U.S.C. § 1109. Under 29 U.S.C. § 1109, Defendants are fiduciaries of the Plan who have a legal obligation to act in the best interests of Plan participants and to comply with federal law. Plaintiff, on behalf of herself and the Plan as a whole, seeks appropriate equitable relief under 29 U.S.C. §§ 1132(a)(2) and (a)(3) to address Defendants' ongoing violations of ERISA's anti-discrimination provisions.

## PARTIES

15.    Plaintiff is, and at all times mentioned herein was, an individual citizen of the State of Texas residing in the County of Ellis. Plaintiff is a former employee of Whataburger, who paid a tobacco surcharge of $13.31 per week (roughly $900 annually) under the Plan. Plaintiff was required to pay this tobacco surcharge to maintain health insurance under the Plan.

16.    Plaintiff is a participant in the Plan pursuant to 29 U.S.C. § 1002(7).

17.    Whataburger is a Texas limited liability company with its principal place of business in San Antonio, Texas. Whataburger is a quick-service restaurant operator that owns, operates, and franchises Whataburger-branded restaurants throughout the United States, employing tens of thousands of workers nationwide. Whataburger is the Plan sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B). Whataburger exercises discretionary authority and control over the management and administration of the Plan, including the design, implementation, and communication of the tobacco surcharge, and is therefore a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). At all relevant times, Whataburger employed tens of thousands of employees and maintained a Plan covering a substantial number of participants and beneficiaries. The Plan is an employee welfare benefit plan subject to ERISA, 29 U.S.C. § 1002(1) and (3). As of December 31, 2024, the Plan covered more than 50,000 participants.

18.    The Committee is identified in the SPD as the "Plan Administrator" and is located in or around San Antonio, Texas. The Committee is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), with respect to the design, administration, and communication of the tobacco surcharge.

19.    Defendants John Does 1–20 are individuals, the identities and capacities of which are presently unknown to Plaintiff, that exercised discretionary authority over the administration, management, or disposition of Plan assets, including the tobacco surcharge, and are therefore fiduciaries under ERISA § 3(21)(A). Plaintiff reserves the right to amend the Complaint to identify these Defendants when their identities are ascertained.

10

**JURISDICTION AND VENUE**

20.     The Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, as this suit seeks relief under ERISA, a federal statute. Upon information and belief, the number of class members is over 1,000, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

21.     This Court has personal jurisdiction over Defendants because Defendants have significant operations in this District, Plaintiff's claims and the claims of all others similarly situated arise from the acts and omissions of Defendants with respect to their activities and conduct concerning Plaintiff in the State of Texas, and Defendants have purposefully availed themselves of the privilege of conducting business in the State of Texas.

22.     Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, Whataburger maintains its principal place of business and conducts business in this District, and Defendants have substantial contacts with and may be found in this District.

**FACTUAL BACKGROUND**

I.     **DEFENDANTS' TOBACCO SURCHARGE VIOLATES ERISA'S ANTI-DISCRIMINATION RULE**

   **A. Statutory and Regulatory Requirements**

23.     Congress amended ERISA to prohibit any health insurer or medical plan from discriminating against participants in providing coverage or charging premiums based on a "health-related factor," including tobacco use. Under this rule, a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution that is greater than such premium or contribution for a similarly situated individual enrolled in the plan based on any health-related factor in relation to the individual or to an

11

individual enrolled under the plan as a dependent of the individual." ERISA § 702(b)(1), 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1).

24.    The statute permits group health plans to "establish[] premium discounts or rebates . . . in return for adherence to ***programs of health promotion and disease prevention***" (29 U.S.C. § 1182(b)(2)(B) (emphases added)); however, these "wellness programs"—to qualify for this statutory safe harbor exception—must strictly adhere to the mandated regulatory requirements.

25.    Under ERISA § 505, 29 U.S.C. § 1135, Congress granted the Department of Labor the authority to issue regulations, including the power to establish regulations prohibiting discrimination against participants and beneficiaries based on their health status under ERISA § 702, 29 U.S.C. § 1182. This authority empowers the Secretary of Labor (the "Secretary") to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of" Title I of ERISA. (29 U.S.C. § 1135). Furthermore, ERISA § 734, 29 U.S.C. § 1191c, explicitly reinforces the Secretary's authority to issue regulations concerning group health plan requirements, which grants the power to "promulgate such regulations as may be necessary or appropriate to carry out the provisions" of ERISA Title I, Part 7. 29 U.S.C. § 1191c; *see also* 42 U.S.C. §§ 300gg-4(n) 300gg-92.

26.    Exercising this delegated authority, in 2006, the Secretary issued regulations through the notice-and-comment rulemaking process outlining the criteria that a wellness program must meet to qualify for the premium non-discrimination exception under ERISA § 702(b). *See* Final Regulations, 33158–59. Following the amendments by the ACA and Public Health Service Acts, in 2010, the Departments published proposed regulations in November 2012 to "amend the 2006 regulations regarding nondiscriminatory wellness programs." *Id.*, 33159. These regulations

(i.e., the Final Regulations) were approved and signed in 2013 to be effective January 1, 2014. *Id.*, 33158.

27.    The Final Regulations specify that health promotion or disease prevention programs, such as outcome-based wellness initiatives (i.e., smoking cessation programs), must meet detailed requirements to qualify for the statutory safe harbor. As the Departments explained, these criteria "***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*, 33163 (emphasis added). "That is," the Departments explained, "these rules set forth criteria for an ***affirmative defense*** that can be used by plans and issuers in response to a claim that the plan or issuer discriminated" against participants. *Id.* (emphasis added). That means once a participant alleges a discriminatory surcharge along with facts showing that the alternative standard offered to them is deficient, the burden then shifts to the employer to prove that the wellness program satisfies *all* the necessary criteria.

28.    The criteria in the Final Regulations are not optional. They serve as the only lawful pathway for plans to impose health-based premium differentials by ensuring that wellness programs do not arbitrarily penalize participants and prevent employers from using surcharges as a revenue-generating mechanism rather than a genuine tool for health promotion. If a wellness program fails to meet even one of these stringent requirements, the program is noncompliant and the employer cannot benefit from the statutory carve-out. *See* § 2590.702(f)(4) (describing the "[r]equirements for outcome-based wellness programs," stating that a program "does not violate the provisions of this section ***only if <u>all</u> of the [] requirements are satisfied***." (emphasis added)).

**B.  Regulatory Criteria**

29.    To comply with ERISA and avoid unlawful discriminatory surcharges, outcome-based wellness programs must meet the following five (5) criteria:

(a) Frequency of opportunity to qualify: Participants must be given at least one chance annually to qualify for the reward associated with the program to ensure ongoing accessibility and fairness. 29 C.F.R. § 2590.702(f)(4)(i).

(b) Size of reward: Penalties or rewards cannot exceed 50% of the cost of employee-only coverage. § 2590.702(f)(4)(ii).

(c) Reasonable design: Programs must be "reasonably designed" to promote health and cannot be "a subterfuge for discriminating based on a health factor." This determination is based on all the relevant facts and circumstances. "To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any individual who does not meet the initial standard based on a measurement, test, or screening. . . ." § 2590.702(f)(4)(iii).

(d) Uniform availability and reasonable alternative standards: "The full reward under the outcome-based wellness program must be available to all similarly situated individuals." § 2590.702(f)(4)(iv).

(e) Notice of availability of reasonable alternative standard: Notice must include (a) instructions on how to access the reasonable alternative standard; (b) contact information for inquiries about the alternative standard; and (c) an explicit statement that participants' personal physician's recommendations will be accommodated. *See* § 2590.702(f)(4)(v).

14

30.    The Departments provided valuable insight into each of the criteria, reflecting their intent to operationalize the statute's protections in a manner that both promotes health and prevents discriminatory practices under ERISA.

31.    Regarding the first criterion, "the once-per-year requirement was included as a bright-line standard for determining the minimum frequency that is consistent with a reasonable design for promoting good health or preventing disease."78 Fed. Reg. at 33162. The once-per-year requirement ensures that participants have a meaningful opportunity to participate in a reasonable alternative standard.

32.    A key requirement of the fourth criterion for outcome-based programs is that the "full reward" must be available to "all similarly situated individuals[,]" regardless of when they meet the reasonable alternative standard during the plan year. *See* Final Regulations, 33165. Critically, the Departments clearly state that it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, *every individual* participating in the program should be able to receive the *full amount of any reward or incentive*. . .." *Id.* (emphases added). While plans have flexibility in determining the manner in which they provide the "full reward," providing the "full reward" to every participant is *mandatory*, regardless of when the participant satisfies the alternative standard. The Departments have made this clear:

> While an individual may take some time to request, establish, and satisfy a reasonable alternative standard, *the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year*. (For example, if a calendar year plan offers a . . . premium discount and an individual . . . satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.) Plans and issuers have flexibility to determine *how* to provide the portion of the reward corresponding to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) *as long as . . . the individual receives the full amount of the reward*.

Final Regulations, 33163 (emphases added).

33.     The Final Regulations provide an example of a non-compliant plan that imposes a tobacco use surcharge but does not facilitate the participant's enrollment in, or participation in, a smoking cessation program. *See id.*, Example 8. Instead, the employer advises the participant to find a program, pay for it, and provide a certificate of completion. *Id*. The Final Regulations conclude that the plan is not compliant because it "has not offered a reasonable alternative standard . . .  and the program fails to satisfy the requirements of paragraph (f) of this section." *Id*.; Final Regulations, 33180.

34.     For health contingent wellness programs, the Final Regulations require that the notice be disclosed "in *all* plan materials describing the terms of" the program. 42 U.S.C. § 300gg-4(j)(3)(E); 45 C.F.R. § 146.121(f)(4)(v) (emphasis added). Further, the Final Regulations establish that "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166. Plans that charge their participants more and fail to inform participants of a reasonable alternative standard to the surcharge violate these requirements.

## II.     DEFENDANTS CANNOT AVAIL THEMSELVES OF ERISA'S SAFE HARBOR

### A.  The Plan

35.     The Plan is an "employee welfare benefit plan" within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1), and a "group health plan" within the meaning of ERISA § 733(a)(1), 29 U.S.C. § 1191b(a)(1).

36.     The Plan is funded by both employer and employee contributions. With respect to medical coverage, the SPD provides that "[t]he Company pays part of the cost for some Benefit Programs and you are responsible (through your Benefit Contributions) for paying your share of the cost of these Benefit Programs for yourself and your family," Ex. A (SPD) at 101, and that the Medical Benefit Program is Self-funded by the Company, id. at 7, 109.[5] Whataburger, as Plan Sponsor, expressly reserves the right to "amend, modify, or terminate this Plan at any time in any manner or with respect to any individual," including "to provide different cost sharing between the Company and participants at any time." *Id.* at 101. *Id.* at 5. Employees pay their share of the cost through "salary reduction contributions" under the Plan, with deductions taken on a pre-tax basis from each paycheck. *Id*

37.     The SPD confirms that, for self-funded benefits, the Company's and employees' contributions are commingled and used to pay benefits from the same source. It provides that "[t]he benefits provided under the Plan will be paid, to the extent permitted under ERISA and the Code, from the general assets of the Company, employee contributions, and insurance contracts," and that "[n]othing in this Plan will be construed to require the Company to maintain any fund for its own contributions or segregate any amount which it is obligated to contribute ***from the general assets of the Company, employee contributions, and insurance contracts*** ." Ex. A at 101 (emphasis added). That admission establishes that any participant contribution, including any tobacco surcharge, directly offsets Whataburger's own contribution obligation, dollar for dollar.

**B.  The Tobacco Surcharge**

---

[5] Unless otherwise noted, quoted Plan language is taken from the SPD, attached hereto as Exhibit A. *See id.* at 5, 19, 34. Plaintiff also relies on the Plan's Enrollment Guide, attached hereto as Exhibit B.

38.    The Plan imposes a tobacco surcharge on every participant who attests during enrollment to being a Tobacco User and enrolls in Plan medical coverage. The SPD defines "Tobacco Use" broadly. Ex. A at 36. The SPD provides that the surcharge is "deducted weekly on a pre-tax basis at the rate stated in the Enrollment Guide for a Family Member and/or Spouse who certify they are Tobacco Users," *id.*—currently $17.31 per week for a participant or covered spouse who is a Tobacco User and $34.62 per week if both the participant and the covered spouse are Tobacco Users. Ex. B (Enrollment Guide) at 13. Upon information and belief, the surcharge has been imposed in materially identical form during each Plan Year relevant to this Complaint, including (at minimum) the 2022, 2023, 2024, and 2025 Plan Years.

39.    The tobacco surcharge therefore imposes an annualized cost of approximately $900 per year on every participant who attests as a tobacco user. For low- and middle-wage employees, the surcharge is a substantial percentage of paycheck deductions and a real-dollar barrier to coverage.

40.    The tobacco surcharge is a "health-contingent wellness program" within the meaning of 29 C.F.R. § 2590.702(f)(1)(ii) because it varies premium contributions based on whether an individual satisfies a standard related to a health factor (non-use of tobacco). *See Baker v. 7-Eleven Inc.*, No. 3:25-cv-01609, 2026 U.S. Dist. LEXIS 33855, at *9–12 (N.D. Tex. Feb. 19, 2026). It is unlawful under 29 U.S.C. § 1182(a)–(b) unless it satisfies each of the conditions set forth in 42 U.S.C. § 300gg-4(j) and 29 C.F.R. § 2590.702(f)(4)).

**C.  Defendants Fail to Provide, or Disclose, A Reasonable Alternative Standard**

41.    Defendants' tobacco surcharge is discriminatory because Defendants do not make available a compliant outcome-based wellness program that ensures that all similarly situated individuals have at least one annual opportunity to obtain the full reward upon completion of an

alternative standard during the Plan year. To satisfy the wellness-program exception, the Plan must (i) make available a reasonable alternative standard, or waiver, by which a participant can avoid the surcharge; (ii) make available the "full reward" to all participants who satisfy that alternative standard; and (iii) provide the participant an opportunity to qualify for the reward at least once per year. *See* 42 U.S.C. § 300gg-4(j)(3)(B)–(E); 29 C.F.R. § 2590.702(f)(4)(i)–(v).

42.    While the SPD references a tobacco cessation program and, separately, an option to "complete a treatment plan recommended by your health care provider," Ex. A (SPD) at 37, the alternative standard Defendants describe does not satisfy the regulatory requirements. The reward available to a participant who completes the alternative standard is, by Defendants' own admission, gated by an arbitrary September 30th deadline, meaning all those who complete after that deadline receive disparate economic treatment. The Enrollment Guide, the principal participant-facing document distributed at open enrollment, does not mention the physician-treatment-plan alternative at all and instead references only the cessation program. Ex. B (Enrollment Guide) at 7, 13.

43.    The "full reward" requirement is a rule of uniform economic treatment. When an individual satisfies a reasonable alternative standard, the plan must provide that individual the same, full reward provided to a similarly situated participant who satisfied the Plan's initial tobacco-use standard, not a prorated, prospective, or otherwise diminished fraction of that reward. 42 U.S.C. § 300gg-4(j)(3)(D); 29 C.F.R. § 2590.702(f)(4)(iv). The Departments confirmed in the regulatory preamble that an individual who satisfies an alternative standard during the plan year must receive the full annual reward, including reimbursement of any surcharge previously collected during that year. *See* 78 Fed. Reg. at 33163.

44.     Whataburger's completion deadline defeats that uniform-treatment requirement by dividing otherwise similarly situated participants into two economically distinct classes based solely on when they complete the alternative standard in the Plan year. Participants who complete the standard by Whataburger's deadline receive the full reward, including the return or avoidance of the entire applicable surcharge, while participants who complete the same standard after that deadline receive only prospective relief, a partial refund, or no refund at all. Those participants are similarly situated in every respect material to the statute and regulation: each was initially subject to the tobacco surcharge, each was entitled to pursue the reasonable alternative standard, and each ultimately satisfied that standard. Yet Whataburger provides them materially different rewards based solely on the timing of completion. Because the full reward rule does not permit a plan to create one class of successful participants who receive the full reward and another class of successful participants who do not, Defendants' Plan violates 42 U.S.C. § 300gg-4(j)(3)(D) and 29 C.F.R. § 2590.702(f)(4)(iv).

45.     Defendants also fail to provide the required notice disclosures in all participant-facing materials discussing the wellness program. The wellness program exception requires the Plan to "disclose in all plan materials describing the terms of the wellness program the availability of a reasonable alternative standard to qualify for the reward (and, if applicable, the possibility of waiver of the otherwise applicable standard)." 42 U.S.C. § 300gg-4(j)(3)(E). Defendants' Enrollment Guides and "Important Notices" document both discuss the wellness program because they discuss the premium differential and the accompanying actions participants must take to try and avoid the surcharge. Neither of these documents, however, contain the required physician-accommodation statement. This omission independently violates the statutory and regulatory requirements for a compliant wellness program.

46.    Had Defendants structured the program in compliance with ERISA, they would have established and made available a reasonable alternative standard through which every single similarly situated individual would receive the same, full reward as what non-tobacco users received. Defendants would not have imposed arbitrary completion dates that result in two similarly situated individuals who complete the same alternative standard in the same plan year receive disparate economic treatment. Defendants also would have clearly disclosed that alternative in *all* plan materials describing the wellness program that there was another alternative avenue available, a physician-directed alternative. Defendants knew how to make those disclosures because they included them in the SPD, a document which, upon information and belief, is not provided to participants during open enrollment. Including the required disclosures in all participant-facing materials describing the program would have enabled participants to understand that there was an alternative to the smoking cessation program that would allow them to obtain the full reward. Instead, Defendants imposed the surcharge without providing a compliant alternative standard and without giving participants the necessary information related to their options in all Plan materials.

47.    Plaintiff paid the tobacco surcharge and does not recall receiving information describing a reasonable alternative standard. Plaintiff recalls an online enrollment process requiring participants to make a selection regarding their tobacco-use status that did not provide any information regarding an alternative standard or a physician accommodation statement. Had Defendants provided clear and compliant disclosures, Plaintiff and similarly situated participants could have taken timely steps to obtain the full reward. Instead, they were deprived of the critical information needed to properly assess their options under the Plan.

48.     Allowing entities like Whataburger to exploit participants and unlawfully extract millions of dollars annually from them without making available a compliant wellness program transforms the surcharge into a "subterfuge for discrimination" and undermines ERISA's purpose of protecting workers from health-based discrimination. If unchecked, this practice would permit employers to manipulate wellness programs as revenue-generating schemes rather than genuine health initiatives, shifting unjust financial burdens onto employees in violation of federal law. This type of conduct violates not only ERISA's antidiscrimination rules governing wellness programs but also the statute's fiduciary duties of loyalty and prudence, as Defendants failed to administer the Plan solely in the interest of participants.

### III.    DEFENDANTS' SELF-DEALING AND MISMANAGEMENT OF PLAN FUNDS

49.     Defendants administered the tobacco surcharge by communicating, each year, with participants about the terms governing the wellness program; by designating which participants qualify to have the surcharge removed and when; and by determining how the surcharge proceeds were used. Defendants withhold the tobacco surcharge directly from participants' paychecks as pre-tax salary-reduction contributions, alongside the required medical premium contributions. These surcharge withholdings are funding for Plan coverage, not separate penalties, and are treated the same way as other Plan contributions.

50.     The SPD makes clear that coverage is self-funded by the Company and that participant contributions and Whataburger contributions are commingled to pay benefits. It states that "[t]he benefits provided under the Plan will be paid, to the extent permitted under ERISA and the Code, from the general assets of the Company, employee contributions, and insurance contracts," and that "[n]othing in this Plan will be construed to require the Company to maintain any fund for its own contributions or segregate any amount which it is obligated to contribute for

22

the benefit of any participant." Ex. A at 101. Because participant contributions and Whataburger's contributions flow into a single undifferentiated pool drawn from the Company's general assets, every dollar of employee contribution, including every dollar of tobacco surcharge, reduces the amount of Company funding that Whataburger would otherwise have had to commit to pay self-funded benefits.

51.    By layering a $17.31 weekly tobacco surcharge on top of participants' required medical premium contributions, Defendants created what should have been a third stream of funding into the Plan: (i) participants' required medical premium contributions; (ii) Whataburger's promised Employer contribution; and (iii) the additional tobacco surcharge. Instead of allowing all three streams to flow into the Plan as a benefit to participants, Defendants used the tobacco surcharge to offset and reduce Whataburger's funding obligation. Because the cost of coverage for each tier is fixed at the start of each Plan Year, every dollar of surcharge collected reduced the company's contribution dollar-for-dollar. The surcharge did not increase resources available to the Plan; it simply shifted costs away from Whataburger and onto participants.

52.    This practice constitutes classic self-dealing. Defendants used the mechanisms of the Plan (i.e., the salary-reduction structure, the Plan's funding hierarchy, and the wellness program apparatus) to realize savings for the company itself, depriving the Plan of the full benefit of the three distinct funding streams it should have received. In doing so, Defendants failed to act solely in the interest of participants and beneficiaries, as ERISA requires. Rather than use the surcharge proceeds to, for example, offset the premiums of non-tobacco users or reduce future premium increases, Defendants used the surcharge to relieve Whataburger's contribution obligation that it otherwise would have had to satisfy out of corporate funds. Upon information and belief, the contribution dollars that Whataburger thereby avoided contributing to the Plan

remained in its own corporate accounts and earned interest for Whataburger, while the Plan was deprived of the full amount of Employer funding it should have received. This diversion violates ERISA's duty of loyalty under 29 U.S.C. § 1104(a)(1)(A) and constitutes a prohibited transaction under 29 U.S.C. § 1106.

## CLASS DEFINITION AND ALLEGATIONS

53.    Plaintiff brings this action individually and on behalf of all other similarly situated individuals, pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure.

54.    Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> **Tobacco Surcharge Class**
> All individuals residing in the U.S. who, during the relevant time period, paid a tobacco surcharge in connection with their participation in a health or welfare plan offered by Defendants.

55.    Excluded from the Class are Defendants' officers and directors. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

56.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a) and (b)(1).

57.    **Numerosity**. This action is appropriately suited for a class action. The members of the Class are so numerous that the joinder of all members is impracticable. Plaintiff is informed, believes, and thereon alleges, that the proposed Class contains thousands of participants who have been damaged by Defendants' conduct as alleged herein, the identity of whom is within the knowledge of Defendants and can be easily determined through Defendants' records.

58.    **Commonality**. This action involves questions of law and fact common to the Class. The common legal and factual questions include, but are not limited to, the following:

a. Whether Defendants' tobacco surcharge discriminates against participants based on a health status related factor;

b. Whether Defendants make available a reasonable alternative standard by which a participant could receive the "full reward" of the tobacco surcharge;

c. Whether Defendants provided the required notice in *all* the Plan materials describing the surcharge;

d. Whether Defendants provided the required statement that participants' personal physicians' recommendations would be accommodated in all Plan materials describing the surcharge;

e. Whether Defendants' wellness program violates ERISA and the Final Regulations;

f. Whether Defendants breached their fiduciary duties by collecting and retaining the tobacco surcharge to offset their own contributions to the Plan;

g. Whether Defendants breached their fiduciary duties by administering the Plan that refuses to reimburse participants who complete an alternative standard;

h. Whether Defendants breached their fiduciary duties by failing to periodically review the terms of their wellness program and the communications sent to participants to ensure compliance with ERISA and applicable regulations;

i. Whether Whataburger breached its fiduciary duty by failing to monitor the activities of the Committee;

j. The appropriate mechanisms to determine damages on a class-wide basis.

59.    **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class, because, *inter alia*, all Class members have been injured through the uniform misconduct described above and were charged improper and unlawful tobacco surcharges. Moreover, Plaintiff's claims are typical of the Class members' claims because Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class. In addition, Plaintiff is entitled to relief under the same causes of action and upon the same facts as the other members of the proposed Class.

60.    **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff and members of the Class each participated in health

and welfare plans offered by Defendants and were harmed by Defendants' misconduct in that they were assessed unfair and discriminatory tobacco surcharges. Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained competent counsel experienced in complex litigation and class action litigation. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

61.    Plaintiff seeks declaratory and equitable relief on grounds generally applicable to the Class. Unless the Class is certified, Defendants will be allowed to profit from their unfair and discriminatory practices, while Plaintiff and the members of the Class will have suffered damages. Unless Class-wide declaratory relief is issued, Defendants may continue to benefit from the violations alleged, and the members of the Class will continue to be unfairly treated.

## CAUSES OF ACTION

### COUNT I
### UNLAWFUL SURCHARGE – FAILURE TO MAKE AVAILABLE A REASONABLE ALTERNATIVE STANDARD
**(Violation of ERISA § 702, 29 U.S.C. § 1182(b) and PHSA § 2705, 42 U.S.C. § 300gg-4(j)(3)(D); 29 C.F.R. § 2590.702(f)(4)(iv))**

62.    Plaintiff re-alleges and incorporates herein by reference all preceding paragraphs as if fully set forth herein.

63.    ERISA prohibits group health plans from charging participants more for coverage based on a health-related factor. 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1). A tobacco surcharge is therefore unlawful unless the plan satisfies *each* condition of the narrow wellness-program exception. *Id.* §§ 1182(b)(2)(B), 300gg-4(b)(2)(B). Tobacco use is a health-related factor. A tobacco surcharge is therefore unlawful unless the plan satisfies every condition of the narrow statutory and regulatory exception for health-contingent wellness programs. 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. §§ 300gg-4(b)(2)(B), 300gg-4(j)(3).

64.     Among those mandatory conditions, a plan must make the same, full reward available to every participant who satisfies a reasonable alternative standard. 42 U.S.C. § 300gg-4(j)(3)(D); 29 C.F.R. § 2590.702(f)(4)(iv). The full reward requirement is a rule of uniform economic treatment: participants who satisfy the alternative standard must receive the same reward made available to similarly situated participants who satisfy the Plan's initial tobacco-use standard, not a prorated, prospective, or otherwise diminished portion of that reward.

65.     Defendants imposed discriminatory surcharges of $17.31 per week for each Tobacco User—and $34.62 per week when both a participant and a covered spouse were Tobacco Users—without making the same, full reward available to all participants who satisfied an alternative standard. Although Defendants describe a tobacco-cessation program and, in the SPD alone, a physician-prescribed treatment-plan alternative, Defendants condition the reward on completion by an arbitrary September 30 deadline. That deadline prevents participants who require additional time from completing the alternative standard and divides participants who satisfy the same alternative into two economically distinct classes: those who complete it by Defendants' deadline and receive the full reward, and those who complete it later and receive only prospective relief, a partial reward, or no reward at all.

66.     Those participants are similarly situated in every respect material to the governing statute and regulation. Each was subjected to the tobacco surcharge, each was entitled to pursue a reasonable alternative standard, and each satisfied the applicable alternative. Defendants nevertheless provide them with disparate economic treatment based solely on the timing of completion within the same Plan year.

67.     Defendants could have complied by permitting participants to complete the reasonable alternative standard throughout the plan year and, upon completion, reimbursing all

27

tobacco surcharges collected during that plan year so that each successful participant received the same, full annual reward. Defendants instead used the September 30 deadline to deny certain successful participants part or all of the reward. While employers have flexibility of access to the program and are not required to make the opportunity available all year, they cannot impose completion deadlines that result in similarly situated individuals being treated differently upon completion of an alternative standard.

68.    Because Defendants failed to make the same, full reward available to participants who satisfied the alternative standard, Defendants cannot invoke the wellness program exception. The resulting surcharge is an unlawful differential in the cost of coverage based on a health-related factor, in violation of 29 U.S.C. § 1182(b) and 42 U.S.C. § 300gg-4(b). Defendants' violation is common to Plaintiff and the Class and may be established through the uniform terms of Defendants' Plan and participant-facing materials without individualized inquiry.

69.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes Plaintiff and Class Members to seek appropriate equitable relief to enjoin Defendants' unlawful practices, redress Defendants' violations, and enforce ERISA and the terms of the Plan. Plaintiff and Class Members are therefore entitled to appropriate equitable relief, including restitution, disgorgement, surcharge, an accounting, declaratory and injunctive relief, and such other relief as the Court deems just and proper.

**COUNT II**
**UNLAWFUL TOBACCO SURCHARGE - FAILURE TO PROVIDE**
**REQUIRED NOTICE**
**(Violation of ERISA § 702, 29 U.S.C. § 1182(b), and PHSA § 2705,**
**42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v))**

70.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

71.    ERISA prohibits group health plans from requiring participants to pay more for coverage based on a health-related factor. 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1). A tobacco surcharge is therefore unlawful unless the plan satisfies every condition of the narrow statutory and regulatory exception for health-contingent wellness programs. 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. §§ 300gg-4(b)(2)(B), 300gg-4(j)(3).

72.    To qualify for that exception, a plan must disclose the availability of a reasonable alternative standard in all plan materials describing the terms of the wellness program. 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v).

73.    The required notice must inform participants that a reasonable alternative standard is available, explain how participants may obtain that alternative, identify whom participants should contact, and state that the recommendations of a participant's personal physician will be accommodated where medically appropriate. These disclosures ensure that participants understand that the surcharge is avoidable and know how to obtain the same, full reward available to non-tobacco users.

74.    Defendants failed to provide those required disclosures. Multiple participant-facing documents describe the tobacco surcharge and the terms of Defendants' wellness program without disclosing all required information, including that Defendants would accommodate the recommendations of a participant's personal physician.

75.    Defendants further failed to clearly and consistently inform participants that a *reasonable* alternative standard was available. While Defendants may have informed participants of an alternative standard, that standard was not reasonable because it violates the full reward rule.

An isolated reference in the SPD does not cure Defendants' failure to include the required notice in all plan materials describing the program's terms because there are other participant-facing materials discussing the terms of the wellness program while omitting the physician-accommodation statement.

76.     Had Defendants complied with the governing notice requirements, they would have clearly disclosed the availability of a reasonable alternative standard in every plan document and participant-facing communication describing the surcharge, including in the enrollment portal that participants use when signing up for benefits. Defendants would also have identified the appropriate contact, explained how to request and complete the alternative, and informed participants that a physician-recommended accommodation would be provided where medically appropriate.

77.     Those disclosures would have enabled Plaintiff and Class Members to understand that the surcharge was avoidable, evaluate the available alternatives, and take the steps necessary to obtain the full reward. Instead, Defendants imposed the surcharge without providing participants the information necessary to exercise their statutory rights.

78.     Compliance with each required element of the notice provision is a mandatory condition of the wellness-program exception. Defendants' failure to provide the prescribed notice independently renders the exception unavailable, regardless of whether Defendants satisfied any other statutory or regulatory condition.

79.     Because Defendants failed to satisfy the notice requirements of 42 U.S.C. § 300gg-4(j)(3)(E) and 29 C.F.R. § 2590.702(f)(4)(v), the tobacco surcharge is an unlawful differential in the cost of coverage based on a health-related factor, in violation of ERISA § 702(b), 29 U.S.C. § 1182(b), and PHSA § 2705, 42 U.S.C. § 300gg-4.

80.     Defendants' violation is common to Plaintiff and the Class and may be established by examining Defendants' uniform Plan documents and participant-facing materials without individualized inquiry.

81.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes Plaintiff and Class Members to seek appropriate equitable relief to enjoin Defendants' unlawful practices, redress Defendants' violations, and enforce ERISA and the terms of the Plan. Plaintiff and Class Members are therefore entitled to appropriate equitable relief, including restitution, disgorgement, surcharge, an accounting, declaratory and injunctive relief, and such other relief as the Court deems just and proper.

## COUNT III
### BREACH OF FIDUCIARY DUTY AND PROHIBITED TRANSACTIONS
(PLAN-LEVEL RELIEF)
(Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109)
(Brought Under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2))

82.     Plaintiff re-alleges and incorporates herein by reference all prior allegations of this Complaint.

83.     ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1), 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). At all relevant times, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). The Plan's own SPD confirms it. The SPD identifies

the Committee as the "Plan Administrator," and provides that "[t]he Plan Administrator and Claims Administrator . . . have full discretionary authority to determine eligibility, status, and rights of all individuals under the Plan and to construe any and all terms of the Plan." Ex. A. at 32.

84.     Outside of its role as Plan sponsor, Whataburger exercised fiduciary discretion in the administration of the Plan and its assets after the Plan was designed in the collection, handling, and disposition of surcharge proceeds, which became Plan assets upon collection from participants (*see* 29 C.F.R. § 2510.3-102) and in the ongoing monitoring (or failure to monitor) the Committee and the Plan's administration to ensure compliance with ERISA over multiple Plan Years.

85.     On information and belief, Defendants used Plan assets (i.e., the surcharge proceeds withheld from participants' paychecks) to offset, dollar-for-dollar, Whataburger's own funding obligations to the Plan, rather than depositing and retaining those Plan assets in trust to fund benefits and accumulate reserves. The SPD makes plain that the Medical Benefit Program is Self-funded by the Company and that "[t]he benefits provided under the Plan will be paid . . . from the general assets of the Company, employee contributions, and insurance contracts," with "[n]othing in this Plan . . . construed to require the Company to maintain any fund for its own contributions or segregate any amount which it is obligated to contribute for the benefit of any participant." Ex. A (SPD) at 101. Because participant contributions and Whataburger's own funding flow into a single undifferentiated pool drawn from the Company's general assets—with no statutory or contractual obligation to keep them separate—every dollar of tobacco surcharge collected from participants reduced, dollar-for-dollar, the amount Whataburger otherwise had to draw from its own corporate assets to pay self-funded claims. The cost savings inured to Whataburger, not to the Plan or its participants.

86.     Defendants further breached the duty of loyalty by preparing and disseminating an Enrollment Guide and Important Notice document that described the wellness program but omitted material information ERISA requires in all plan materials describing the wellness program, including a statement that the recommendations of an individual's personal physician will be accommodated. *See* 29 C.F.R. § 2590.702(f)(4)(v); 42 U.S.C. § 300gg-4(j)(3)(E). As fiduciaries, Defendants had a duty to communicate truthfully and completely about the Plan's terms in *every* participant-facing material describing the program, not the SPD alone. The Enrollment Guide and Important Notice are documents participants consult at open enrollment to make their tobacco-user election. Defendants' omissions from those documents deprived participants of the information necessary to make a fully informed election or to pursue an alternative path to the full reward, information that, had it been disclosed, may have directly reduced participants' cost-sharing and increased the funding flowing to the Plan from Whataburger.

87.     Year after year, the Committee administered the Plan within the meaning of 29 U.S.C. § 1002(16) and was a fiduciary within the meaning of 29 U.S.C. § 1002(21). Upon information and belief, the Committee participated in the effort to funnel surcharge funds into the Company's general assets while administering a wellness program whose September 30th deadline foreclosed full reward relief for similarly situated participants who completed the alternative standard later in the Plan Year.

88.     Upon information and belief, the Committee controlled and disseminated Plan communications, including the Enrollment Guide and Important Notice documents that described the tobacco surcharge but failed to include the statutorily required disclosures, most notably the physician-accommodation statement. The Committee also failed to conduct periodic, prudent reviews of the wellness program's design and its participant-facing communications to ensure

33

compliance with ERISA. Instead, it allowed a program whose September 30th completion deadline produced disparate treatment among similarly situated Tobacco Users—refunding the surcharge to participants who completed the smoking cessation program on or before September 30th, but denying any reward to participants who completed the same alternative one day later—to persist year after year, despite its discriminatory effect and clear inconsistency with the full reward rule.

89.     The Committee further breached its fiduciary duties by administering a Plan that did not conform with ERISA's anti-discrimination requirements. It acted disloyally by permitting surcharge funds to offset Whataburger's own funding obligations and by maintaining a program that—by tying the refund to completion of the smoking cessation program by an arbitrary September 30th deadline—granted the full reward to one subset of similarly situated participants (timely completers) while withholding it from another (late completers), in direct violation of 42 U.S.C. § 300gg-4(j)(3)(D) and 29 C.F.R. § 2590.702(f)(4)(iv)'s requirement that "[t]he full reward . . . be available to all similarly situated individuals." It also failed to include in the Enrollment Guide and Important Notice document the disclosures required by 29 C.F.R. § 2590.702(f)(4)(v). These omissions and design choices are incompatible with ERISA's fiduciary mandates of loyalty, prudence, and adherence to governing law.

90.     ERISA also imposes on appointing fiduciaries (i.e., Whataburger) the duty to monitor and supervise the actions of those administering the Plan (i.e., the Committee). By allowing administrators and benefits staff to implement and maintain a non-compliant wellness program that violated ERISA's notice and full-reward requirements, Whataburger breached its duty to monitor. Whataburger failed to review the program's design, the disposition of surcharge proceeds, and the accuracy of participant communications, despite its obligation to ensure the Plan's ongoing compliance with federal law.

91.     As a result of these breaches, Whataburger was unjustly enriched at the expense of the Plan and its participants. By deducting surcharges directly from employees' paychecks without administering a compliant wellness program or providing full-year reimbursement, the Committee secured financial savings for the employer while shifting costs to participants. The structure and administration of the program ensured that not all "similarly situated individuals" could receive the full reward, and participants were deprived of clear notice of the reasonable alternative standard. In effect, Defendants converted employee contributions (i.e., Plan assets) into a source of corporate savings, in violation of 29 U.S.C. § 1104(a)(1)(A).

92.     By withholding unlawful surcharges and using those funds to offset Whataburger's financial obligations, Defendants caused the Plan to engage in transactions constituting a direct or indirect transfer of Plan assets for the benefit of a party-in-interest—namely, Whataburger—in violation of 29 U.S.C. § 1106(a)(1). Whataburger is a party-in-interest under 29 U.S.C. § 1002(14) because it is both the Plan sponsor and a fiduciary exercising discretionary authority over the Plan's administration and finances.

93.     Whataburger's conduct caused harm to the Plan. The Plan was deprived of assets that should have been deposited, retained, invested, and used to fund benefits and accumulate reserves for participants. Instead, those assets were used to reduce Whataburger's own corporate contribution obligation. The Plan also suffered an opportunity-cost loss. Had Whataburger either refrained from collecting unlawful surcharge amounts or treated those amounts as supplemental Plan funding rather than as a substitute for its own contribution obligation, the trust would have held more assets, accumulated greater reserves, and maintained a stronger funding base.

94.     Whataburger also obtained wrongful profits from its use of Plan assets. The savings Whataburger achieved by offsetting its own actuarially determined contribution obligation were

profits made through the use of Plan assets. Under ERISA § 409(a), Whataburger, the Committee, and its individual members are liable to "restore to such plan any profits of such fiduciary which have been made through use of assets of the plan." 29 U.S.C. § 1109(a).

95.    As a direct and proximate result of these fiduciary breaches, Plaintiff seeks Plan-wide relief under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). Defendants are liable to make good to the Plan all losses resulting from their breaches, restore all profits obtained through the use of Plan assets, disgorge the corporate savings Whataburger achieved by offsetting its own contribution obligations, and provide other appropriate equitable relief, including an accounting, constructive trust, equitable lien, and removal or replacement of fiduciaries who breached their duties. *See* 29 U.S.C. § 1109(a).

## COUNT IV
### BREACH OF FIDUCIARY DUTY (INDIVIDUAL RELIEF)
### (Violation of ERISA §§ 404 and 406, 29 U.S.C. §§ 1104 and 1106)

96.    Plaintiff re-alleges and incorporates herein by reference each preceding allegation of this Complaint as if fully set forth herein.

97.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant to seek individualized equitable relief for a fiduciary's breach of duty. Defendants breached their fiduciary duties by collecting unlawful tobacco surcharges from participants, treating those amounts as Plan assets, and using them to reduce the Company's own contribution obligations rather than administering them solely for the benefit of participants and beneficiaries. That same conduct also constituted prohibited transactions under 29 U.S.C. § 1106(a)(1)(D) and § 1106(b)(1), because Whataburger used Plan assets for its own benefit.

98.    Plaintiff suffered individualized harm from Whataburger's conduct. She paid tobacco surcharges that should not have been imposed. She was also deprived of the benefit of

having those contributions deposited, retained, and used in the Plan's trust to fund benefits and accumulate reserves solely in participants' interests. Because the Plan's funding structure ties participant contributions to the Plan's assets, reserves, and expected benefit obligations, Plaintiff also bore, and continues to bear, higher contribution costs and increased risk of future cost increases or benefit reductions.

99.     Plaintiff and the Class therefore seek individualized equitable relief under 29 U.S.C. § 1132(a)(3). That relief includes equitable restitution of unlawfully collected surcharge amounts traceable through Defendants' handling and commingling of Plan funds; disgorgement of profits and corporate savings Whataburger obtained through its use of Plan assets; an accounting of all surcharge amounts collected and used to offset Whataburger's contribution obligations; imposition of a constructive trust or equitable lien over funds wrongfully retained by Whataburger; and declaratory relief prohibiting Whataburger from continuing to administer a noncompliant wellness program or using Plan assets to reduce its own contribution obligations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. An Order certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative for the Class, and appointing the undersigned to act as Class Counsel;

B. A declaratory judgment that the unlawful and discriminatory tobacco surcharges imposed on participants violate ERISA's anti-discrimination provisions set forth in ERISA § 702, 29 U.S.C. § 1182;

C.  An Order instructing Defendants to reimburse all persons who paid the unlawful and discriminatory surcharge;

D.  A declaratory judgment that Defendants breached their fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, instituting a surcharge on participants without offering a reasonable alternative standard in violation of ERISA's anti-discrimination provisions and for failing to notify participants of an alternative standard, and for failing to adequately monitor the terms of the Plan, the surcharge, and the wellness program, as well as communications with participants, to ensure they complied with ERISA and the applicable regulations;

E.  An Order requiring Defendants to provide an accounting of all prior payments of the surcharges under the Plan;

F.  Declaratory relief as necessary and appropriate, including an Order that Defendants' program was unlawful and that Defendants should not further violate the duties, responsibilities, and obligations imposed on them by ERISA with respect to the Plan and ordering Defendants to remit all previously collected surcharges;

G.  Disgorgement of any benefits or profits Defendants received or enjoyed due to the violations of ERISA § 702, 29 U.S.C. § 1182(b);

H.  Restitution of all surcharge amounts Defendants collected;

I.  Surcharge from Defendants totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendants as a result of their collection of the unlawful and discriminatory tobacco surcharges;

J.  Relief to the Plan from Defendants for their violations of ERISA § 404, 29 U.S.C. § 1104, under 29 U.S.C. § 1109, including a declaration that the tobacco surcharges are

unlawful; restoration of losses to the Plan and its participants caused by Defendants' fiduciary violations; disgorgement of any benefits and profits Defendants received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to members who paid the surcharges; removal and replacement of the Plan's fiduciaries, and all appropriate injunctive relief, such as an Order requiring Defendants to stop imposing the unlawful and discriminatory surcharges on participants in the future.

K.  An award of pre-judgment interest on any amounts awarded to Plaintiff and the Class pursuant to law;

L.  An award of Plaintiff's attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

M.  Any other relief the Court determines is just and proper.

Dated: June 16, 2026,                                Respectfully submitted,


                                        /s/ *Walker D. Moller*
                                        _____

                                        **SIRI & GLIMSTAD LLP**
                                        Walker D. Moller, Esq. (Bar No.24092851)
                                        Oren Faircloth (*pro hac vice* forthcoming)
                                        William H. Payne (*pro hac vice* forthcoming)
                                        1005 Congress Avenue, Suite 925-C36
                                        Austin, TX 78701
                                        Tel: (717) 967-5529
                                        E: wmoller@sirillp.com
                                        E: ofaircloth@sirillp.com
                                        E: wpayne@sirillp.com


                                        *Attorneys for Plaintiff and the Proposed Class*